IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHARLES STOKES

        Plaintiff,

v.                                1:15-cv-00079-RB-LF

RUSS LANDAVISO,

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on defendant Detective Russ Landavazo's[1]

*Martinez*[2] report filed, November 9, 2015.  Doc. 21.  Plaintiff Charles Stokes filed his response

to the *Martinez* report on January 15, 2016.  Doc. 25.  Detective Landavazo filed his reply in

support of the *Martinez* report and a notice of completion of briefing on February 5, 2016.  Doc.

26, 27.  The Honorable District Judge Robert C. Brack referred this case to me "to conduct

hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required

to recommend to the Court an ultimate disposition of the case."  Doc. 18.  Having read the

submissions of the parties and being fully advised in its premises, I find that Officer Landavazo

is entitled to qualified immunity and recommend that Stokes' complaint be dismissed with

prejudice.

## I.      Background Facts and Procedural Posture

On March 22, 2012, Stokes was indicted for murder in the first degree (open count),

bribery/intimidation of a witness, and tampering with evidence.  Doc. 21-16 at 29–30.  The

charges were based on events that took place on March 7, 2012, which resulted in the shooting

---

[1] Detective Landavazo is identified by Stokes as "Russ Landaviso" in the complaint.

[2] *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978).

death of Rene Barbier.  Following an investigation, Detective Landavazo drafted a warrant for

the search of "a single wide mobile home at the northeast corner of Badger Ln. and Adobe Rd. in

Veguita, New Mexico, with no visible address," Doc. 21-16 at 21, and for the arrest of "AKA

Florida," a "Black male adult, approximately 6'0" tall."  Doc. 21-16 at 24, 26–28.  A judge

reviewed and approved the warrants on March 8, 2012.  Doc. 21-16 at 23–24, 28.  That same

day, officers executed the warrants and arrested Stokes.  According to Stokes' complaint, he

spent 15 months in jail awaiting trial, and his bail was set at $500,000.00, cash-only.  Doc. 1 at 2.

At trial, Stokes prevailed on a motion for directed verdict.  *Id.*

Stokes sued Detective Landavazo, District Attorney Kari Brandenburg, and Assistant

District Attorney Natalie Strub under 42 U.S.C. § 1983 for a violation of his Fourth, Fifth, and

Eighth Amendment rights.  Doc. 1.  Upon initial screening, the Court dismissed Brandenburg

and Strub, dismissed Stokes' Eighth Amendment claims, and construed Stokes' Fifth

Amendment due process claim against Detective Landavazo as a Fourteenth Amendment due

process claim.  Doc. 6.  The Court ordered Detective Landavazo to prepare a *Martinez* report.

Doc. 16.  Detective Landavazo's *Martinez* report includes a motion for summary judgment based

on qualified immunity.  Doc. 21.

## II.    Legal Standards

### A.  Standard for Summary Judgement

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for

summary judgment has the initial burden of establishing, through admissible evidence in the

form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence,

that there is an absence of evidence to support the opposing party's case.  *Celotex Corp. v.*

2

*Catrett*, 477 U.S. 317, 323 (1986).  If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  Although all facts are construed in favor of the nonmoving party, it still is the nonmoving party's responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment."  *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury.  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  A *Martinez* report also is treated as an affidavit.  *Id.*  A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits.  *Id.* at 1109. Conclusory allegations, however, without specific supporting facts, have no probative value and cannot create a genuine issue of fact.  *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992).  As is true with all affidavits, statements of mere belief must be disregarded.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

The Court liberally construes Stokes' filings because he is appearing pro se.  *Hall*, 935 F.2d at 1110.  Nevertheless, the non-moving party still must "identify specific facts that show the existence of a genuine issue of material fact."  *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted).  Conclusory allegations are insufficient

to establish an issue of fact that would defeat the motion. *Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 557 (10th Cir. 2001).

B. Qualified Immunity

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" *Siegert v. Gilley*, 500 U.S. 226, 232, (1991). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231.

When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir.2009). In *Pearson*, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir.2001).

C.  Claims under 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.  "[Section] 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal citations and quotations omitted).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins,* 487 U.S. 42, 48 (1988).  There is no dispute that Detective Landavazo was acting under color of state law.  The dispute lies in whether Detective Landavazo violated Stokes' constitutional rights.

Stokes contends that in obtaining an arrest warrant, Detective Landavazo withheld exculpatory evidence, falsified the criminal complaint, tampered with evidence at the scene, and coerced witnesses.  Stokes further alleges that Detective Landavazo arrested him without probable cause and maliciously pursued a criminal case against him.  Basically, Stokes argues that he was arrested under false pretenses, which led to his lengthy detention while he was being prosecuted, and that his arrest and detention were unlawful.  Stokes' claims, therefore, include a claim for a violation of his Fourth Amendment rights as well as a claim for a violation of his Fourteenth Amendment right to due process based on his alleged false arrest, false imprisonment, and malicious prosecution.

### III.  Discussion

A.  <u>Undisputed Material Facts</u>

Detective Landavazo sets forth a statement of facts that provides background and details of the Albuquerque Police Department (APD) investigation into the death of Barbier.  Doc. 21 at 3–15.  Some of the facts in Detective Landavazo's statement of facts, however, are not material to the determination of whether he is entitled to qualified immunity and summary judgment.

> [T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted . . . .  [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, some of Detective Landavazo's facts are not included here.

Stokes does not specifically dispute the facts set forth by Detective Landavazo.  Instead, Stokes lists what he considers admissions by Detective Landavazo, and discusses the witness interviews and defects in the affidavit with respect to each witness's statement.  Doc. 25 at 2–12.  Because Stokes does not specifically dispute any of the material facts, the undisputed material facts come either from those listed by Detective Landavazo in his *Martinez* report or directly from information in the record.

I find that the undisputed material facts are as follows:

1.     At 2:50 p.m. on March 7, 2012, Detective J. Kelly of the Albuquerque Police Department ("APD") responded to a shooting callout at 500 Chama, Albuquerque, New Mexico, and observed an unconscious male on the ground of the parking lot suffering from apparent gun shot wounds.  Doc. 21 at 3; Doc. 21-16 at 22.

2.      The male, who was later identified as Rene Barbier, was transported to the University of New Mexico Hospital, where he was pronounced dead.  Doc. 21 at 3.

3.      At approximately 3:40 p.m. that same day, APD Sgt. Barboa notified APD Detective Russ Landavazo of a violent crime call at 500 Chama SE Albuquerque, New Mexico. *Id.*

4.      After arriving at the scene, Detective Landavazo attended a briefing conducted by Detective Kelly.  *Id.*

5.      During the briefing, Detective Kelly advised that he and other officers spoke to several witnesses (Saul Nevarez, Marisela Bustillos, Nicole Mishoe, and April Lozano) who said that two dark skinned males may have been involved in the shooting.  *Id.* at 3–4.

6.      One of the males described by the witnesses was wearing a red hooded sweatshirt and appeared to run from the scene towards the nearby apartments at 437 Mesilla SE and into unit #202.  The witnesses said that the other male drove away from the scene in a red or burnt orange four-door car.  *Id.* at 4.

7.      Detective Landavazo learned from Detective Kelly that Nevarez described a "reddish four-door 'Ford Focus' outside with a black male driver, the victim in the front passenger seat, and a black male rear seat passenger."  Doc. 21-1 at 7.

8.      Mishoe said the vehicle she saw was "a burnt orange car."  Doc. 21-4 at 24, 26–27.

9.      Bustillos described seeing a new red or maroon car.  Doc. 21-1 at 7–8; Doc. 21-5 at 29, 32.

10.     Two officers located a red/burnt orange vehicle at 400 Rainbow Ct. SE that matched the description of the vehicle identified by witnesses.  Doc. 21 at 4–5.

11.    Officers transported witnesses Saul Nevarez, Marisela Bustillos, and Nicole Mishoe to the vehicle location and asked whether the vehicle was involved in the shooting.[3] Doc 21 at 5.

12.    While Nevarez and Bustillos denied the vehicle at 400 Rainbow was the one they saw, Mishoe said that she was positive it was the vehicle involved in the shooting. *Id*.; Doc. 21-4 at 36–37.

13.    Detective Landavazo learned from the briefing that Bustillos stated she saw two black males, one wearing a red hooded sweatshirt, meet up with a male driving a red four-door vehicle.  Doc. 21-1 at 7.

14.    During the briefing, Detective Kelly said that in the initial investigation of the incident, officers made contact with three individuals in unit #202 at 437 Mesilla SE: Andre Wallace, Alondo Butler, and Juanita Neil.  Doc. 21 at 4, 7.

15.    Detective Kelly also stated during the briefing that a grey Honda Civic LX was found near the scene that was registered to the decedent, Barbier.  Doc. 21 at 4.  Barbier's cell phone was located inside this vehicle.  *Id*. at 10.

16.    Officers re-interviewed the eyewitnesses and recorded their statements.  Doc. 21 at 5.

17.    In his recorded statement, Nevarez again identified the shooter's vehicle as a newer model, red four-door car, possibly a Ford Focus.  *Id*. at 6; Doc. 21-6 at 9.

18.    Nevarez described the shooter as a large black man, taller than 6 feet, around 200 pounds.  Doc. 21-6 at 10.

19.    In her recorded statement, Mishoe described the shooter as Hispanic with dark hair, 5'9" tall, and 180 pounds.  Doc. 21-4 at 31–32.

---

[3] Witness April Lozano also was transported to the vehicle at 400 Rainbow Ct. SE, but her observations are not relevant to the issues presented here.  Doc. 21 at 5.

20. Alondo Butler was interviewed by police at around 9:15 p.m. on March 7, 2012. Doc. 21 at 8; Doc. 21-8 at 13.

21. Butler told police that he knew Barbier (the victim), and that he met up with Barbier at around 2:00 p.m. on the afternoon of March 7, 2012. Doc. 21 at 9.

22. Butler said that Barbier asked him to mediate a dispute between Barbier and an individual named "Florida" regarding a drug deal that had gone bad. *Id.*

23. Butler stated that Florida arrived at 500 Chama in a maroon, four-door car that looked like a new Chevy Cobalt. *Id.*; Doc. 21-8 at 29–30.

24. Butler described Florida as a black man, about 5'10", 190 to 200 pounds. Doc. 21 at 9; Doc. 21-8 at 25–26.

25. Butler explained that he and Barbier entered Florida's car, and Barbier and Florida began to argue. Doc. 21 at 9. Florida pulled out a gun and told Barbier to get out of his car or he would "burn" him. *Id.*

26. Florida then got out of the car and walked to the front passenger side door, where Barbier was sitting. *Id.* at 10. Barbier also got out and punched Florida in the face, so Florida shot Barbier three times. *Id.*; Doc. 21-8 at 27, 32.

27. Butler told Detective Landavazo that Barbier had called Florida earlier in the day so they could talk about the drug deal, and therefore that Florida's number could be found on Barbier's cell phone. Doc. 21 at 10; Doc. 21-9 at 19–20, 23–24.

28. A search of Barbier's cell phone revealed that the last outgoing call he made was to 359-1311. Doc. 21 at 10.

29. After the recorded interview, Butler advised Detective Landavazo that Florida had called Butler's cell phone shortly after he drove away from the scene and told Butler

not to talk to the police about what he had seen.  Doc. 21 at 10; Doc. 21-1 at 21.

30.  Detective Landavazo searched Butler's cell phone, and Butler identified Florida's phone number as 359-1311.  *Id*.

31.  Detective Vollmer contacted the wireless carrier of the number 359-1311 and was given the longitudinal and latitudinal coordinates where the phone was located.  Doc. 21 at 11.  These coordinates placed the phone in the area of Adobe Street and Badger Street in Veguita, New Mexico.  *Id.*

32.  Officers responded to the Veguita location and found a red four-door Nissan Sentra parked in the driveway of a trailer located on the northeast corner of Adobe Street and Badger Street.  *Id.*; Doc. 21-2 at 27.

33.  Although there were two other trailers located within the coordinates, neither had a car parked near it matching the description given by the witnesses.  Doc. 21 at 11.

34.  Detective Landavazo drafted a search warrant for the trailer and an arrest warrant for "AKA 'Florida,' a 'Black male adult, approximately 6'0" tall.'"  *Id*.; *see also* Doc. 21-16 at 24, 26.  True copies of the Affidavit for Search Warrant, Warrant for Arrest, and Criminal Complaint – Arrest Warrant Affidavit are attached to the *Martinez* Report.  Doc. 21-16 at 21–28.

35.  When the officers executed the search warrant on March 8, 2012, Stokes was among the people found in the trailer.  Doc. 21 at 11.  Stokes matched the description on the arrest warrant of a black male adult, approximately 6'0" tall.  *Id*.; Doc. 21-2 at 28.

36.  Stokes told Detective Vollmer that his phone number was 505-359-1311, and that he goes by the name of "Florida."  Doc. 21 at 12; Doc. 21-2 at 28.

37.     Detective Vollmer turned Stokes over to Detective Landavazo, who arrested Stokes. Doc. 21-1 at 36; Doc. 21-2 at 28.

   B.  Fourteenth Amendment Claim for Malicious Prosecution

A plaintiff charging the government with unconstitutional imprisonment has at least two potential constitutional claims:  (1) a plaintiff who has been seized and imprisoned without legal process may have a Fourth Amendment claim analogous to a tort claim for false arrest or false imprisonment; and (2) a plaintiff who has been seized and imprisoned pursuant to legal but "wrongful" process may have a Fourth Amendment claim analogous to a tort claim for malicious prosecution.  *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (as amended on denial of reh'g Jan. 8, 2014).  "Unreasonable seizures that occur after the institution of legal process can also form the basis for Fourteenth Amendment malicious-prosecution claims where an adequate state remedy does not exist."  *Id.* at 1194, n.3 (citing *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008)).  Stokes, however, cannot sustain a Fourteenth Amendment malicious prosecution claim under § 1983 because there is an adequate remedy under state law.

"The Fourteenth Amendment protects individuals against deprivations of liberty without due process of law."  *Myers*, 738 F.3d at 1193 (citing U.S. CONST. amend. XIV, § 1).  "If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, than an adequate post-deprivation remedy—such as a state tort claim—will satisfy due process requirements."  *Id.* (citing Becker *v. Kroll*, 494 F.3d 904, 921 (10th Cir. 2007)).

Here, Stokes alleges that Detective Landavazo conjured up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution.  "Such lawlessness could not have been anticipated or prevented pre-deprivation, but a post-deprivation malicious-prosecution claim serves as an effective antidote."  *Meyers*, 738, F.3d at 1193.  New Mexico law provides

that remedy. *See, e.g.*, *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 701, 204 P.3d 19, 26 (outlining the elements of a malicious abuse of process claim under New Mexico law); N.M. STAT. ANN. § 41-4-12 (law enforcement officers are not immune from liability for injuries resulting from various torts, including malicious prosecution). "The existence of the state remedy flattens the Fourteenth Amendment peg on which [Stokes] now tries to hang his § 1983 malicious-prosecution claim." *Meyers*, 738, F.3d at 1193. Because post-deprivation state tort remedies exist and satisfy due process requirements, I find that Stokes has an adequate remedy under state law. I therefore recommend that Stokes' claim under the Fourteenth Amendment be dismissed with prejudice.

C. Fourth Amendment Claim for Malicious Prosecution

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. amend. IV. To establish a Fourth Amendment claim for malicious prosecution under § 1983, Stokes must prove that (1) Detective Landavazo caused Stokes' continued confinement or prosecution; (2) the original action terminated in favor of Stokes; (3) no probable cause supported the original arrest, continued confinement, or prosecution of Stokes; (4) Detective Landavazo acted with malice; and (5) Stokes sustained damages. *Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)). As Detective Landavazo points out, "[t]he focal point for claims of wrongful arrest, detention, and prosecution under [§] 1983 is whether there is probable cause supporting an arrest." Doc. 21 at 17 (citing *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006)); *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017) ("a pretrial restraint on liberty is unlawful unless a judge (or grand jury) first makes a reliable finding of probable cause"); *Wong Sun v. United States*, 371 U.S. 471, 481–82 (1963) ("The arrest warrant procedure serves to insure that the

deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause."); *Bailey v. United States*, 568 U.S. 186, 192 (2013) ("[T]he general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime.").

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). Probable cause is not based on proof beyond a reasonable doubt or by a preponderance of the evidence. *Florida v. Harris*, 568 U.S. 237, 243 (2013). The prosecution does not need to establish a *prima facie* case in order to establish probable cause. *St. John v. Justmann*, 771 F.2d 445, 448 (10th Cir. 1985). Instead, "it may establish probable cause for issuance of an arrest warrant by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Id.* The courts only require a "'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" *Id.* (internal citation omitted).

Stokes contends that the affidavit used to support his arrest is defective because Detective Landavazo omitted certain information that was exculpatory and included certain information that was false. Before a warrant for an arrest or a search can issue, the Fourth Amendment requires that a judicial officer "be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971). When faced with the determination of probable cause where the plaintiff alleges the existence of false statements and material omissions, the Tenth

Circuit directs as follows:

> [T]he court's task is to determine whether the document, shorn of the false information, would still demonstrate probable cause to believe that the plaintiff committed the crime in question. If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Taylor v. Meacham,* 82 F.3d 1556, 1562 (10th Cir.1996). "If hypothetically correcting the misrepresentation or omission would not alter the determination of probable cause, the misconduct was not of constitutional significance and is not actionable under § 1983; but if this hypothesizing would alter the probable-cause determination, the misconduct undermined Fourth Amendment guarantees and may support redress under § 1983." *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006) (citation omitted).

In this case, hypothetically correcting the misrepresentation or omission does not alter the determination of probable cause. The alleged misconduct by Detective Landavazo is not of constitutional significance and is not actionable under § 1983.

    1. *Probable Cause in the Affidavit*

The Criminal Complaint – Arrest Warrant Affidavit (hereinafter "affidavit") drafted by Detective Landavazo established probable cause to arrest Stokes for the crimes charged.[4]

_____

[4] The criminal complaint charged Plaintiff with the crimes of murder, intimidation of a witness, and tampering with evidence. "Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused: (1) by any kind of willful, deliberate and premeditated killing; (2) in the commission of or attempt to commit any felony; or (3) by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life. Whoever commits murder in the first degree is guilty of a capital felony." N.M. STAT. ANN. § 30-2-1. "Bribery or intimidation of a witness consists of any person knowingly: . . . (3) intimidating or threatening any person or giving or offering to give anything of value to any person with the intent to keep the person from

Detective Landavazo included the following information obtained from the investigation into his affidavit.

Butler, an eyewitness to the shooting, identified "Florida" as the shooter. Doc. 21-9 at 11–12; Doc. 21-16 at 27 (Butler is identified as "A.B." in the affidavit). Butler told the police that Barbier had spoken with Florida prior to the shooting to set up a meeting, and so Florida's number would be on Barbier's cell phone. Doc. 21-2 at 38; Doc. 21-9 at 20, 23–24, 25, 28; Doc. 21-16 at 27. When the police searched Barbier's cell phone, they found that the last outgoing call was to 359-1311 at approximately 2:27 p.m. Doc. 21-16 at 27. The shooting took place less than a half hour later, at around 2:50 p.m. Doc. 21-16 at 26; Doc. 26-1 at 1. Butler also told the police that after the shooting, "'Florida' called [Butler's] cell phone and threatened that he better not talk to the police about what he had witnessed." Doc. 21-16 at 27. Butler identified Florida's number on his cell phone as 359-1311. *Id*.; *see also* Doc. 21-1 at 21. Detective Landavazo relayed the phone information to detectives who were able to locate the phone to within an 80-meter radius at a location in Veguita, New Mexico. Doc. 21-16 at 27. Within that 80-meter radius was a trailer with a red four-door car parked in the carport next to the trailer. *Id*.

Several witnesses say they saw the shooter drive away in a car that was some hue of red, and that was in the class of vehicles that matched the car parked next to the trailer. For example, Mishoe described the shooter's car as a nice-looking, "burnt orange" car. Doc. 21-4 at 18, 20, 24, 26-27. Bustillos said the car was between a red and a maroon color and was "a new car."

---

truthfully reporting to a law enforcement officer or any agency of government that is responsible for enforcing criminal laws information relating to the commission or possible commission of a felony offense or a violation of conditions of probation, parole or release pending judicial proceedings." N.M. STAT. ANN. § 30-24-3. "Tampering with evidences consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." *See* N.M. STAT. ANN. § 30-22-5.

Doc. 21-5 at 29.  Nevarez described the shooter's car as a newer model, four-door, red car, possibly a Ford Focus.  Doc. 21-6 at 6, 9 (speaking through an interpreter).  Butler described Florida's vehicle as a new, maroon, Chevy Cobalt, with four doors.  Doc. 21-8 at 30.  At the trailer located in Veguita, NM, officers observed a red, four-door 2011 Nissan Sentra parked in the driveway on the south side of the trailer.  Doc. 21-16 at 27.  There was no other vehicle in the area matching this description.  Doc. 21-2 at 27.

The facts presented to the judge in the criminal complaint demonstrated a substantial probability that a crime had been committed, and that a man known by the name "Florida," with the phone number 359-1311 and who drove a red four-door sedan committed the crime.  When the officers executed the search warrant on the property on March 8, 2012, Stokes was among the people found in the trailer.  Doc. 21 at 11.  When the police encountered Stokes, he confirmed that his phone number was 359-1311.  Doc. 21 at 12; Doc. 21-2 at 28; Doc. 21-12 at 29.  Stokes also confirmed that he went by the moniker "Florida."  Doc. 21-2 at 28; Doc. 21-12 at 30.  Stokes matched the description on the arrest warrant of a black male adult, approximately 6'0" tall.  Doc. 21 at 12; Doc. 21-2 at 28.  In other words, sufficient information in the affidavit, combined with the information gathered by the police when they executed the search warrant, established probable cause to arrest Stokes.

In support of his arrest warrant, Detective Landavazo specifically used information from Marisela Bustillos, Saul Nevarez, and Alondo Butler.  Stokes' criticisms of each are addressed below.

2.  *Marisela Bustillos*

Stokes contends that Detective Landavazo changed Marisela Bustillos' statement in several ways.  First, in the affidavit, Detective Landavazo noted that "M.B." (Marisela Bustillos)

said "she heard several shots fired and looked out her window." Doc. 21-16 at 22, 26. Stokes argues that this is incorrect because Bustillos waited until it was quiet before she looked out her window. Doc. 25 at 4, ¶ 13. While Detective Landavazo's affidavit implies that Bustillos immediately looked out her window, the detective's failure to include a precise time period between what Bustillos heard and when she looked out her window does not make the affidavit incorrect. Nevertheless, reading the facts in the light most favorable to Stokes, the Court will add to the affidavit that "Bustillos waited until it was quiet and then" looked out her window. I find that the adding this language to the affidavit has no effect on the determination of probable cause.

Next, Detective Landavazo states in the affidavit that Bustillos "stated the male in the red hooded sweatshirt ran East on Bell," and that she said that "she recognized the red vehicle as being a drug dealer who frequents the area." Doc. 21-16 at 26. Stokes contends that Bustillos did not say this in her recorded statement. Doc. 1 at 7; Doc. 21 at 22; Doc. 25 at 13. Although Bustillos said that she saw a red or maroon car, Doc. 21-5 at 29, 32, and saw a man in a red jacket walking around the neighborhood, Doc. 21-5 at 28, Stokes is correct that Bustillos did not say in her recorded statement that she recognized the red vehicle as belonging to a drug dealer who frequents the area.[5] That statement will be omitted from the affidavit. I find that the

---

[5] Although Bustillos did not say "the male in the red hooded sweatshirt ran East on Bell," and that "she recognized the red vehicle as being a drug dealer who frequents the area" in her recorded statement, Detective Kelly interviewed Bustillos prior to Detective Landavazo's arrival at the scene. In the interview with Detective Kelly, Bustillos said "she saw two black males, one wearing a red hooded sweatshirt; meet up with a male driving a red four door vehicle. Marisela said she heard three gunshots and believed the driver of the vehicle shot one of the other males. Marisela said the driver of the red car left the scene north on Chama and east on Bell and the male in the red hooded sweatshirt ran north on Chama." Doc. 21-1 at 7–8. Detective Kelly relayed this information to Detective Landavazo. *Id.* "Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest," as long as such

omission of this language has no effect on the determination of probable cause.

In the affidavit, Detective Landavazo writes that "M.B. stated the male in the red hooded sweatshirt ran East on Bell to the apartments on the Northwest corner of Bell and Mesilla into apartment number 202." Doc. 21-16 at 22. Stokes points out, however, that Bustillos did not say this in her recorded statement. In fact, Bustillos said that she didn't know where the man in the red sweatshirt went. Doc. 25 at 4; Doc. 21-5 at 30. This language also will be omitted from the affidavit. I find, however, that the omission of this language has no effect on the determination of probable cause.

3. *Saul Nevarez*

Stokes argues that Detective Landavazo misstated Saul Nevarez's statement. Doc. 25 at 5. In the affidavit, Detective Landavazo writes that "S.N." (Saul Nevarez) said:

> the rear male passenger exited the vehicle and was wearing a red hooded sweatshirt with a grey shirt. S.N. stated the male wearing the red sweatshirt made a phone call with a cell phone and ran from the scene East on Bell to apartments located on the corner of Bell and Mesilla.

Doc. 21-16 at 26. Stokes is correct. In his recorded statement, Nevarez said that the male in the rear passenger seat was wearing a brown sweatshirt. Doc. 25 at 5; Doc. 21-6 at 12. The Court will omit the "red" sweatshirt color from the affidavit and replace it with "brown" sweatshirt in the affidavit. Nevertheless, I find that the color of the hooded sweatshirt has no effect on the determination of probable cause.

---

reliance is "objectively reasonable." *Oliver v. Woods*, 209 F.3d 1179, 1190–91 (10th Cir. 2000). Although Detective Landavazo was entitled to rely on information relayed to him by Detective Kelly, viewing the facts in the light most favorable to Stokes, I will accept Stokes' version of the facts and disregard Bustillos' statements to Detective Kelly.

4. *Alondo Butler*

Stokes describes Alondo Butler as "the main witness to this crime and he was the major part to the information the [Detective] Landavazo used to get a warrant for my arrest." Doc. 25 at 12. Knowing the importance of Butler's statement, Stokes attempts to discredit Butler by suggesting Butler was under the influence of crack cocaine when he gave his statement, and by pointing out that Butler lied to police during the course of his interview. Doc. 1 at 4; Doc. 25 at 8, 9, 13, 15. Evaluations of witness credibility, however, are inappropriate at the summary-judgment stage. The Court's role is not to weigh the evidence. *Anderson*, 477 U.S. at 249; *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986) ("a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences").

> The standard for evaluating probable cause is whether the officer has "reasonably trustworthy" information sufficient to lead a prudent person to believe that the person arrested has committed the offense. In determining whether an officer has sufficient reasonably trustworthy information to constitute probable cause, clearly established case law requires officers to look at the "totality of the circumstances."

*Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998). It is Stokes' burden to show that the evidence Detective Landavazo relied upon was not reasonably trustworthy. *Romero v. Fay*, 45 F.3d 1472, 1476 & n.1 (10th Cir. 1995).

Stokes points out that Andre Wallace told police that he and Butler smoked a "stone" when Butler came to his house the day of the shooting around 3:00 in the afternoon. Doc. 21-7 at 16, 18, 33, 34. Butler, on the other hand, did not state he had used drugs that day. *See generally* Doc. 21-8 at 12–32. Juanita Neil stated that Wallace and Butler did not do any drugs that afternoon. Doc. 21-7 at 4. Even assuming that Wallace was telling the truth, Butler did not give his statement to the police immediately after the shooting—which occurred around 2:50 in

the afternoon.  Doc. 21-16 at 22.  Rather, the police interviewed Butler over six hours later at around 9:00 p.m.  Doc. 21-8 at 13.  There is no indication that Butler was under the influence of drugs when he was interviewed by police.

Stokes also attempts to discredit Butler's statement by pointing out that Butler changed his story though the course of his statement and lied to the police.  Doc. 25 at 12, 15.  Butler's statement did change during the course of his interview.  For example, Butler told the police that he "barley" knew the victim.  Doc. 21-3 at 37; Doc. 21-8 at 16.  Later Butler explained that Barbier called Butler and asked Butler to talk to Florida on his behalf.  Doc. 21-9 at 14, 20.  At first, Butler said that he did not know the name of the guy Barbier was meeting.  Doc. 21-8 at 27.  Later in the interview, Butler admitted that he knew that the name of the guy who shot Barbier was "Florida."  Doc. 21-9 at 12–13.  Butler actually knew Florida and previously had purchased "weed" from him.  Doc. 21-9 at 21, 26.  Butler explained that he didn't tell the officers Florida's name at first because he was afraid of retaliation, and he knew "what he's capable of because I [saw] it firsthand for myself."  Doc. 21-9 at 11, 13.

Further, Butler initially said that Florida's phone number was not on his phone, Doc. 21-9 at 16, and that after the shooting he talked to his girlfriend and no one else, Doc. 21-8 at 35–40.  Later Butler explained that "Florida" called him after the shooting and told him to not talk to the police, so Florida's number would be on his phone.  Doc. 21-1 at 21.  Butler's statement was corroborated when the officers examined both Butler's and Barbier's phones and found Florida's phone number on both of them.  Doc. 21 at 10; Doc. 21-1 at 21; Doc. 21-9 at 19–20, 23–24.  Stokes later confirmed that this was his phone number, and that he went by the moniker "Florida."  Doc. 21-12 at 29–30.  Thus, despite the changes in his story during the course of the interview, I find that under the totality of the circumstances, a reasonable officer would believe

that Butler's statement was reasonably trustworthy.

5. *Nichole Mishoe*

Stokes argues that Detective Landavazo failed to include in his affidavit that Nichole Mishoe positively identified another car as the shooter's car.  Doc. 25 at 13.  Two officers located a red/burnt orange vehicle at 400 Rainbow Ct. SE that matched the description of the vehicle identified by witnesses.  Doc. 21 at 4–5.  The officers took Mishoe to the vehicle, and she positively identified it as the vehicle she saw at the scene.  *Id.* at 5; Doc. 21-4 at 36–37. Detective Landavazo did not include this fact in his affidavit.

There were two occupants in the vehicle identified by Mishoe, a male and a female. Mishoe could not positively identify the male and did not recognize the female.  Doc. 21-4 at 37–38.  Nevarez and Bustillos were sure that the car at 400 Rainbow was <u>not</u> the vehicle involved in the shooting.  Doc. 21-1 at 10.  The officers thoroughly investigated whether the occupants of the vehicle stopped at 400 Rainbow were involved in the shooting and determined that they were not involved in Barbier's death.  *See* Doc. 21 at 5; Doc. 21-1 at 10, 15–16; Doc. 21-14 at 24 thru Doc. 21-15 at 24.  Under the totality of the circumstances, the officers had reasonably trustworthy information to determine that the vehicle identified by Mishoe was not the vehicle involved in the shooting.  Accordingly, I find that adding the information that Mishoe identified another vehicle as the one belonging to the shooter—when two other witnesses stated that it was not the right vehicle, and the police determined that the occupants of the vehicle were not involved in the shooting—did not have an effect on the determination of probable cause.

6. *Stokes' Other Arguments are Unavailing.*

Stokes argues that none of the witnesses gave the same description of the car.  Doc. 25 at 14.  I find this argument unpersuasive.  All of the witnesses gave the same general description of

the shooter's car. None of the witnesses described anything other than a vehicle that matched the same physical characteristics of the red Nissan Sentra parked at the trailer where Stokes was found. None of the witnesses said that the car was blue, white, green, yellow, black, or grey. All of the witnesses agreed that the car was some shade of red. None of the witnesses described the shooter's vehicle as a truck or SUV. All of the witnesses described the car as a four-door compact sedan. There was nothing particularly unusual about the red Nissan Sentra parked at the trailer where Stokes was found, and it matched the general description given by all of the witnesses.

Stokes further points out the discrepancies in the several witness statements. Doc. 25 at 5–9 (discussing the statements of witnesses Sherry Archuleta, Nicole Mishoe, Jeannie Rocque, April Lozano Juanita Neil, and Andre Wallace). Discrepancies in witness statements, however, do not necessarily negate probable cause. *See Taylor v. Meacham*, 82 F.3d 1556, 1562–63 (10th Cir. 1996) (inaccuracies in affidavit and inconsistencies in witnesses' statements did not negate the similarities between the witnesses' statements and did not affect the determination of probable cause); *Romero*, 45 F.3d at 1477 ("Once [the officer] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of [the victim], his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.").

Stokes also contends that no one picked him out of a photo array, and fingerprints did not connect him to the murder. Doc. 1 at 7; Doc. 25 at 14. Detective Landavazo did not base his statement of probable cause in the affidavit on photo identification or fingerprints. Instead, the affidavit was based on an eyewitness's statement that the shooter was known by the name "Florida," the fact that the victim and the eyewitness both had matching phone numbers in their

phones that the eyewitness claimed belonged to the shooter, the location information derived from the shooter's phone number, and the fact that a car similar to the one driven by the shooter was found at this location. When the police also encountered Stokes at this location, Stokes informed Detective Vollar that his phone number was 359-1311, and that he went by the moniker "Florida." Doc. 21-2 at 28. This evidence established probable cause to arrest Stokes.

## IV.    Recommendation

The undisputed material facts establish that although some of the details provided in the affidavit were incorrect, even if the Court were to hypothetically correct the alleged misrepresentations or omissions contained in the affidavit, those corrections would not affect the determination of probable cause. Detective Landavazo's alleged misconduct, therefore, was not of constitutional significance, and is not actionable under § 1983. Detective Landavazo is entitled to judgment as a matter of law and qualified immunity because Stokes cannot establish a violation of his constitutional rights.

Accordingly, I recommend that the Court GRANT Detective Landavazo's motion for summary judgment and DISMISS Stokes' complaint with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

Laura Fashing
United States Magistrate Judge